IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| CYNTHIA PEOPLE, | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No.: RDB 05-971 |
| PRIMO ELECTRIC COMPANY, INC., | * | |
| *et al.*, | * | |
| Defendants. | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM OPINION

This employment discrimination action arises out of a Complaint filed by Plaintiff Cynthia

People ("Plaintiff" or "People") against Defendant Primo Electric Company, Inc., Robert Wilson,

Ray Hopkins, and Darcia C. Perini (collectively, "Defendants").[1]  The Complaint alleges that,

*inter alia*, Defendants discriminated against Plaintiff because of her race and sex in violation of

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII").  Pending before

this Court is Defendants' Motion for Summary Judgment, (Paper No. 22), and Defendants'

Motion to Strike certain evidence proffered by Plaintiff, (Paper No. 26).  Defendants contend that,

*inter alia*, they are entitled to judgment as a matter of law because Plaintiff failed to establish a

*prima facie* case of discrimination or create a genuine issue of material fact regarding the matter

of pretext.  This Court has jurisdiction under 28 U.S.C. § 1331.  The parties' submissions have

---

[1]      Plaintiff alleges in her Complaint that Defendant Primo Electric Company, Inc.
trades as "Primo Electric" and "Prime Net."  In their moving papers, Defendants aver that Primo
Electric Company, Inc. and Prime Net are "partners."  (Def.'s Mem. Supp. Summ. J. p. 4.)  The
parties do not make an issue of the precise relationship between these entities, and this matter
has no effect on the Court's ruling herein.

been reviewed and no hearing is necessary.  *See* Local Rule 105.6 (D. Dd. 2004).  For reasons

that follow, Defendants' Motion to Strike is DENIED-IN-PART and GRANTED-IN-PART and

Defendants' Motion for Summary Judgment is GRANTED.  As a result, this case will be

CLOSED.

## BACKGROUND AND PROCEDURAL HISTORY

This Court reviews the facts of this case in the light most favorable to the party opposing

the motion.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Plaintiff Cynthia People is an African-American woman who lives in the State of Maryland.

Defendant Primo Electric Company, Inc. ("Primo") is a commercial electrical construction

contractor whose primary office is in Maryland.  At the time of Plaintiff's employment with

Primo and its partners, Defendant Robert Wilson ("Wilson") was the President of Primo,

Defendant Ray Hopkins ("Hopkins") was the Vice President of the Baltimore Division of Primo,

and Defendant Darcia C. Perini ("Perini") was the Director of Human Resources for Primo.

On March 10, 2003, Plaintiff was hired by PrimeNet as a CAD Operator.[2]  PrimeNet is a

telecommunication company that specializes in voice, data, video, and security communication

systems.  PrimeNet shares an office and is a "partner" with Primo. (Def.'s Mem. Supp. Summ. J.

p. 4); *see* n.1 *supra* (noting that the parties do not make an issue of the precise relationship

between Primo and PrimeNet and that this matter has no effect on the Court's ruling herein).

Plaintiff was chosen for her position as CAD Operator from an applicant pool consisting of two

black males, three white males, and one black female.  (Def.'s Mem. Supp. Summ. J. Ex. 3.)

---

[2]      CAD is an acronym for "computer-aided design," "computer-assisted design,"
"computer-aided drafting," or some similar phrase.  CADD is a related acronym that means
"computer-aided design and drafting."

Plaintiff's responsibilities as CAD Operator included "producing CADD engineering documents" or drawings from "manual sketches that [were] created by the various project managers." (Def.'s Mem. Supp. Summ. J. Ex. 1 p. 61, ll. 8-13 (Deposition of Cynthia People ("People Dep.")).) In her position as CAD Operator, Plaintiff reported to an African-American male named Solomon Abate.

In April 2003, Mr. Abate saw Plaintiff accessing the internet for personal reasons during work hours. Mr. Abate warned Plaintiff that it violates company policy to use company equipment and resources—including accessing the internet—for personal business. About one week later, Plaintiff informed Mr. Abate that she was resigning and submitted a letter of resignation. (Def.'s Mem. Supp. Summ. J. Ex. 5 (Resignation Letter dated 4/22/03 providing that "as of May 30, 2003, I will voluntarily terminate my employment with this company.").)

Mr. Abate immediately told his supervisor Corey Jovan about Plaintiff's decision to resign. Mr. Jovan requested assistance from Ms. Perini "in the hope that the Company could retain Cynthia as a CAD Operator." (Def.'s Mem. Supp. Summ. J. Ex. 6 (Affidavit of Cory Jovan p. 1 ("Jovan Aff.")).) Ms. Perini scheduled a meeting with Plaintiff, Mr. Jovan, and Mr. Abate for purposes of addressing Plaintiff's concerns. Following this meeting, Plaintiff rescinded her resignation. (*See* Def.'s Mem. Supp. Summ. J. Ex. 5 (copy of Plaintiff's Resignation Letter dated 4/22/03 marked as "VOID"); People Dep. p. 118, ll. 14-16 ("Q. And then [you] canceled [the resignation letter]; is that right? Voided it, canceled it? A. I did not void it. Darcia Perini voided it.").) However, a few weeks later, Messrs. Jovan and Abate received complaints that Plaintiff was using company resources—including accessing the internet—for personal business. (Jovan Aff. p. 1.)

In May 2003, Plaintiff told Mr. Jovan that she intended to take a paid vacation day on June 4, 2003. (*Id.*) Mr. Jovan explained to Plaintiff that she "needed to get a Leave Request Form from the Administrative Assistant, complete the form, and get signature/approval from [Mr. Abate] and myself." (*Id.*) Plaintiff did not comply with these procedures and was absent from work on June 4, 2003. (*Id.*) On June 5, 2003, when Plaintiff returned to work, Mr. Jovan met with Plaintiff to discuss her failure to follow company procedure for requesting vacation time and using company resources for personal business. (Jovan Aff. pp. 1-2.) Plaintiff explained that her real estate business had been very busy for the past few weeks and she was trying to keep up. (*Id.*) As a result, Messrs. Jovan and Abate issued a written warning to Plaintiff. (*See* Def.'s Mem. Supp. Summ. J. Ex. 7 (Providing that "[i]f [Plaintiff] is witnessed conducting non-PrimeNet business during working hours without approval, she will be disciplined and possibly terminated.").)

In mid-June 2003, Plaintiff requested and accepted a transfer to the position of Electrical Coordinator at Primo. (*See*, *e.g.*, People Dep. pp. 95-97.) This transfer did not result in a change to Plaintiff's "job level" or pay rate. (*See* Def.'s Mem. Supp. Summ. J. Ex. 8.) Plaintiff was selected for this position from an applicant pool consisting of one white female, one Asian male, and one black female. (*See* Def.'s Mem. Supp. Summ. J. Ex. 9 (copy of "Applicant Flow Log for Electrical Coordinator Position").) Plaintiff reported to Todd Davis, a white male. (*See* People Dep. p. 99.)

Before accepting the position, Plaintiff spoke with Robert Wilson, Primo's President. Plaintiff was told that she would receive an interim review 30-45 days after beginning the new position. Plaintiff agreed to this interim or "special performance evaluation" as a condition of her

transfer, and was told that if she showed that she could do the job she would get a salary increase. (*See* Def.'s Mem. Supp. Summ. J. Ex. 8 (Internal Request for Personnel Action dated June 20, 2003 (indicating "Interim Review within 30-45 days."))); People Dep. p. 98, ll. 20-22 ("Q.  So Mr. Wilson was the person who discussed the special evaluation, right?  A.  He initiated that conversation.").)[3]

In her new position as Electrical Coordinator, Plaintiff was responsible for assisting with the expansion of the Baltimore County Detention Center by reviewing drawings and coordinating the placement of electrical raceways, cable trays, cabinets, lighting fixtures, and other components within designated areas.  (Def.'s Mem. Supp. Summ. J. Ex. 12 (Supplemental Affidavit of Ray Hopkins p. 1 ("Supp. Hopkins Aff.")).)  Plaintiff was expected to produce a set of coordinated drawings that would reflect planned installation heights, dimensions, and locations.  (*Id.*)

On July 21, 2003, Mr. Hopkins was assigned to supervise Plaintiff.  (*See* Def.'s Mem. Supp. Summ. J. Ex. 12 (Affidavit of Ray Hopkins p. 1 ("Hopkins Aff.")).)  Mr. Davis, who was initially responsible for supervising Plaintiff, was spending too much time at the job site to effectively supervise Plaintiff on a day-to-day basis.  (*Id.*)  Shortly after assuming responsibility for supervising Plaintiff, Mr. Hopkins decided to delay her evaluation "because the Company still had not received the electronic documents for the [Baltimore County Detention Center] project and I did not have a fair opportunity to review her ability to perform the essential functions of her

---

[3]        There is no reasonable dispute that "special performance evaluations" are consistent with Primo's company policy or that Mr. Hopkins completed "special performance evaluations" in 2003 with respect to employees other than Plaintiff.  (*See* Def.'s Mem. Supp. Summ. J. Ex. 11 (copies of other "special performance evaluations" performed by Mr. Hopkins).)

job." (*Id*. at pp. 1-2.)  Plaintiff apparently remained under the impression that Mr. Davis was her

supervisor.  (*See* People Dep. p. 99, ll. 11-13 ("A. How long did [Mr. Davis] stay?  Q. As your

direct supervisor?  A. Until the day I got terminated.").)

In mid-October 2003, Plaintiff was asked to interpret electronic trade drawings for the

Baltimore County Detention Center project and coordinate the electrical work on the project.

(Supp. Hopkins Aff. ¶ 4.a.)  Mr. Davis met with Plaintiff to review the drawing skills required for

the Electrical Coordinator position.  (Hopkins Aff. p. 1.)  During this meeting, Mr. Davis

completed the first set of drawings while Plaintiff observed, and Plaintiff was then asked to

complete a "second set" of drawings.  (*Id*.)  The resulting set of drawings were unusable.  (*Id*.)

On October 29, 2003, Mr. Hopkins met with Plaintiff to conduct her "special performance

evaluation."  Mr. Hopkins's review provides that Plaintiff "is not able to interpret the documents

as we anticipated and therefore [is] not able to perform the tasks [associated with the Electrical

Coordinator position].  Cynthia has proven to be a very capable CAD operator, however. . . ."

(Def.'s Mem. Supp. Summ. J. Ex. 13 p. 5 (completed evaluation form for Plaintiff's "special

performance evaluation").)  Mr. Hopkins informed Plaintiff that he was reassigning her as a CAD

Operator at the same "job level" and pay rate as the Electrical Coordinator position.  (*See id*.; *see

also* Hopkins Aff. p. 1.)  Plaintiff told Mr. Hopkins that she was unhappy and disagreed with her

reassignment.  Plaintiff submitted a written response to the evaluation and provided a copy to Ms.

Perini.  (*See* Def.'s Mem. Supp. Summ. J. Ex. 14.)

On November 4, 2003, Mr. Hopkins saw Plaintiff accessing the internet during work

hours.  (Hopkins Aff. p. 1.)  Mr. Hopkins sent Plaintiff an email providing:

> Cynthia, I noticed this morning as I walked by your office around
> 10:10 that you were on the internet.  I [cannot] foresee any business

> related reason that would require the use of this tool for your
> present tasks.  We provide this as a tool for business use only.
> Please refrain from personal use during the work day.  I will only
> allow personal use during lunch break.  RAY

(Def.'s Mem. Supp. Summ. J. Ex. 16.)

On November 7, 2003, Mr. Hopkins and Plaintiff exchanged emails regarding Plaintiff's vacation and personal hours.  (*See* Def.'s Mem. Supp. Summ. J. Ex. 17.)  Mr. Hopkins noted that Plaintiff had exceeded her vacation and personal leave time for the year.  Plaintiff then supplied an itemized explanation for her attendance.  Mr. Hopkins responded by thanking Plaintiff for the clarification, acknowledging a mistake on his part, and outlining a procedure for future requests for time off:

> Cynthia, . . . I did see the additional time on most of the days you
> have stated and considered it time needed for your work, not as
> comp. or make up time, as we have no such program. . . . Please
> note that I will grant make up time only under "special
> circumstances" if I am notified prior to the time needed and that is
> the way it should be handled in the future. . . .

(*Id.*)

On November 7, 2003, Plaintiff met with Ms. Perini to discuss her concerns with the conduct of Mr. Hopkins.  The meeting was later summarized by Ms. Perini:

> On 11/7/03 you stated that Ray Hopkins, your daily supervisor, was
> creating a hostile work environment for you because he sent 2
> emails warning you of excessive absences and unapproved internet
> usage during working hours in addition to just giving you a special
> performance evaluation (dated 10/29/03) which was the worse [sic]
> you had ever received and that the performance evaluation was not
> correct because you know how to perform the duties of Electrical
> Coordinator.

(Def.'s Mem. Supp. Summ. J. Ex. 18 p. 1 (Memorandum from Ms. Perini to Plaintiff dated 11/20/03).)  Ms. Perini notes that she instructed Mr. Davis to meet with Plaintiff a second time to

-7-

review her drawings and that the "third set" of drawings produced by Plaintiff at that meeting were incorrect.  (*Id*. ("3 out of 4 drawings were incorrect—the only one correct was the one Todd showed you specifically how to complete.").)  Ms. Perini also notes that she directed Mr. Hopkins "to address your excessive absences and unapproved internet usage during working hours separately from the special performance evaluation so that the focus of the special performance evaluation would be only on your job performance in the new position of Electrical Coordinator." (*Id*.)  Finally, Ms. Perini indicated that, based upon Plaintiff's input, one of the ratings on Plaintiff's evaluation would be raised.  (*Id*. at p. 2 ("The rating on your special performance evaluation (dated 1/29/03) under Safety/Pride for "Takes proper care of company property (equipment, facilities, etc.) has been corrected from a 2 to 3.").)

In early to mid-November 2003, Mr. Hopkins observed that Plaintiff re-positioned her computer monitor so that it could not be viewed by individuals passing in the hallway.  (*See* Hopkins Aff. pp. 1-2.)  Mr. Hopkins felt that there was no business reason for moving the monitor and became concerned that Plaintiff was not complying with his instructions to refrain from using the internet during work hours, which is specifically prohibited in Primo's employee handbook. (*Id*. at p. 2; *see also* Def.'s Mem. Supp. Summ. J. Ex. 18 p. 36 (where employee handbook prohibits "[e]xcessive personal use of Primo communication systems") & Ex. 20 (form signed by Plaintiff acknowledging receipt of employee handbook).)

Mr. Hopkins met with Mr. Wilson to request that Primo monitor Plaintiff's internet usage. This request was approved.  The resulting internet monitoring reports confirmed that Plaintiff was accessing the internet for personal reasons during work hours.  (*See* Def.'s Mem. Supp. Summ. J. Exs. 21-22.)  In an email to Plaintiff's supervisors, Mr. Wilson noted that "[Plaintiff] is

continuing to spend significant time during the work day visiting real estate and personal sites,

doing job searches and transmitting her resume, and recently studying an IT Help Desk manual."

(*Id*. at Ex. 23.)   Plaintiff does not dispute that one report shows her accessing the internet for

personal reasons for more than 20 hours over a nine-day period.   (*See* Def.'s Mem. Supp. Summ.

J. p. 12.)

On December 12, 2003, Plaintiff was terminated for violating Primo's policy regarding

Electronic Communications.   (*See* Def.'s Mem. Supp. Summ. J. Ex. 25 (notice of employee

termination.)   Plaintiff does not dispute that no one was hired to replace her, or that her duties

were assumed by other Primo employees.

On March 10, 2004, after a hearing related to Plaintiff's application for unemployment

benefits, an Administrative Law Judge for the Maryland Unemployment Insurance Appeals

issued a decision providing:

> The claimant was terminated by the employer for violating the
> employer's policy with respect to unauthorized internet usage
> during work time.  The claimant has raised the allegation of racism
> as a reason for her termination.  The claimant admitted that she did,
> in fact, use the internet during work hours in violation of the policy
> against such usage.

(*See* Def.'s Mem. Supp. Summ. J. Ex. 27 p. 1.)   The Administrative Law Judge concluded that:

> The totality of the testimony and evidence presented at the hearing
> indicate that the claimant was discharged for misconduct due to her
> unauthorized use of the internet during work hours.  This examiner
> is not in the position to evaluate the merits of the claimant's
> allegation of racial discrimination.  Rather a review of the
> employer's policy and the claimant's admission that she did utilize
> the internet during work time is sufficient evidence to support a
> finding of gross misconduct under the Maryland Unemployment
> Insurance Law.  The claimant's conduct demonstrates deliberate
> and willful disregard of the standards that the employer had a right
> to expect and also is a series of repeated violation of employment

rules that prove a regular and wanton disregard of the employee's
obligations.

(*Id*. at p. 3 (finding that "[t]he claimant is disqualified from receiving [unemployment] benefits. . .

.")

On November 7, 2003, Plaintiff faxed a letter to the Equal Employment Opportunity

Commission for purposes of complaining about alleged discriminatory employment practices at

Primo.  On January 23, 2004, Plaintiff filed a formal Charge of Discrimination with the EEOC/

Maryland Commission on Human Relations.  On November 30, 2004, the EEOC issued a Notice

of Right to Sue. (*See* Def.'s Mem. Supp. Summ. J. Ex. 27 (providing that "[This notice] has been

issued at your request" and that "[t]he EEOC is terminating its processing of this charge.").)

On February 24, 2005, Plaintiff filed this Complaint in the Circuit Court for Baltimore

City, Maryland.  (Paper No. 2.)  On April 7, 2005, Defendants removed this action to this Court.

(Paper No. 1.)  On January 20, 2006, Defendants filed their Motion for Summary Judgment.

(Paper No. 22.)  On February 21, 2006, Defendants filed their Motion to Strike.  (Paper No. 26.)

On February 27, 2006, this Court stayed this matter pending the disposition of bankruptcy

proceedings against Integrated Electrical Services, Inc., the corporate parent of Defendant Primo

Electric Company, Inc.  (Paper No. 29.)  On March 15, 2006, this Court ordered that this matter

be administratively closed without prejudice to the right of any party to move to reopen this

action upon conclusion of those bankruptcy proceedings.  (Paper No. 31.)  On June 27, 2006,

after the bankruptcy proceedings concluded, this Court lifted the stay and reopened this matter.

(Paper No. 33.)

## **STANDARD OF REVIEW**

Summary judgment is appropriate under Rule 56(c) of the Federal Rules of Civil Procedure when there is no genuine issue as to any material fact, and the moving party is plainly entitled to judgment in its favor as a matter of law.  In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986), the Supreme Court explained that, in considering a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.  Thus, "the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Id.* at 252.

In undertaking this inquiry, a court must view the facts and the reasonable inferences drawn therefrom "in the light most favorable to the party opposing the motion," *Matsushita*, 475 U.S. at 587 (quoting *United States v. Diebold*, Inc., 369 U.S. 654, 655 (1962)); *see also E.E.O.C. v. Navy Federal Credit Union*, 424 F.3d 397, 405 (4th Cir. 2005).  However, the opponent must bring forth evidence upon which a reasonable fact finder could rely. *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986).  "Once the movant has established the absence of any genuine issue of material fact, the opposing party has an obligation to present some type of evidence to the court demonstrating the existence of an issue of fact." *Pension Ben. Guar. Corp. v. Beverley*, 404 F.3d 243, 246-47 (4th Cir. 2005) (citing *Pine Ridge Coal Co. v. Local 8377, UMW*, 187 F.3d 415, 422 (4th Cir. 1999)).

This Court has previously held that a "party cannot create a genuine dispute of material

fact through mere speculation or compilation of inferences." *Shin v. Shalala,* 166 F. Supp. 2d 373, 375 (D. Md. 2001) (citations omitted). Indeed, this Court has an affirmative obligation to prevent factually unsupported claims and defenses from going to trial. *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993) (quoting *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987)).

## DISCUSSION

### I.    The Complaint.

Plaintiff's Complaint asserts 13 causes of action. These claims are identified in the following chart:

| Count | Cause of Action |
|---|---|
| 1 | Unlawful race discrimination under Title VII. (Compl. ¶¶ 14-25.) |
| 2 | Unlawful sex discrimination under Title VII. (*Id.* at ¶¶ 26-30.) |
| 3 | Unlawful retaliation under Title VII. (*Id.* at ¶¶ 31-38.) |
| 4 | Equal protection violation based on race discrimination under 42 U.S.C. § 1983. (*Id.* at ¶¶ 39-42.) |
| 5 | Equal protection violation based on sex discrimination under 42 U.S.C. § 1983. (*Id.* at ¶¶ 43-46.) |
| 6 | Unlawful race discrimination under 42 U.S.C. § 1981 (*Id.* at ¶¶ 47-51.) |
| 7 | Unlawful race-based retaliation under 42 U.S.C. § 1981 (*Id.* at ¶¶ 47-51.) |
| 8 | Intentional infliction of emotional distress. (*Id.* at ¶¶ 56-59.) |
| 9 | Intentional misrepresentation. (*Id.* at ¶¶ 60-64.) |
| 10 | Fraud. (*Id.* at ¶¶ 65-68.) |
| 11 | Negligence. (*Id.* at ¶¶ 69-74.) |
| 12 | Wrongful termination. (*Id.* at ¶¶ 75-78.) |
| 13 | Conversion. (*Id.* at ¶¶ 79-82.) |

Plaintiff appears to seek approximately $310 Million in connection with these claims.

## II.     **Motion to Strike**.

Defendants move to strike the "Affidavit of Cynthia People" submitted by Plaintiff in connection with her opposition papers on the following grounds:

> This document is inadmissible, *ab initio*, as it is not a properly completed, sworn and notarized affidavit as required by the federal rules, and furthermore contains several inadmissible hearsay statements and rank speculation.

(Def.'s Mem. Supp. Mot. Strike p. 4); *see also* Fed. R. Civ. P. 56(e) ("Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.").

After reviewing the parties' submissions, this Court finds that the proposed affidavit substantially complies with the requirements of 28 U.S.C. § 1746.[4]  The document is signed and dated by Plaintiff under the statement: "I solemnly swear and affirm, under the penalties of

---

[4]     28 U.S.C. § 1746 provides in relevant part:

> Wherever, under any law of the United States or under any rule, regulation, order, or requirement made pursuant to law, any matter is required or permitted to be supported, evidenced, established, or proved by the sworn declaration, verification, certificate, statement, oath, or affidavit, in writing of the person making the same (other than a deposition, or an oath of office, or an oath required to be taken before a specified official other than a notary public), such matter may, with like force and effect, be supported, evidenced, established, or proved by the unsworn declaration, certificate, verification, or statement, in writing of such person which is subscribed by him, as true under penalty of perjury, and dated, in substantially the following form: . . . If executed within the United States, its territories, possessions, or commonwealths: "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on (date). (Signature)".

perjury, and based on my personal knowledge, the contents of the foregoing are true and correct."

(People Aff. p. 2.)  Under Fed.R.Civ.P. 56(e) and 28 U.S.C. § 1746, this filing qualifies as an

affidavit.  As a result, there is no basis for striking Plaintiff's affidavit in its entirety and, with

respect to this matter, Defendants' Motion to Strike is DENIED.

      Defendants also challenge the admissibility of several statements *within* Plaintiff's

affidavit.  Specifically, Defendants request that this Court strike the following provisions of

Plaintiff's affidavit:

- "To the best of my knowledge, Todd Davis did not have an experience as an electrical coordinator."  (People Aff. ¶ 4.)

- References to the "list of white employees . . . who had used Primo's internet and computer for personal business during office hours" that Plaintiff gave to Ms. Perini.  (*Id*. at ¶ 10.)

(*See* Def.'s Mem. Supp. Mot. Strike p. 5.)  Defendant argues that Plaintiff's statement about Mr.

Davis is inadmissible under Rule 602 of the Federal Rules of Evidence, which requires that "[a]

witness may not testify to a matter unless evidence is introduced sufficient to support a finding

that the witness has personal knowledge of the matter."  Fed. R. Evid. 602.  Defendants also

contend that the "list of white employees" referenced in Plaintiff's affidavit and attached as

Exhibit 6 to Plaintiff's opposition papers is inadmissible under Rule 401, which provides that

evidence is relevant when it "ha[s] any tendency to make the existence of any fact that is of

consequence to the determination of the action more probable or less probable than it would be

without the evidence."  Fed. R. Evid. 401; *see also* Fed. R. Evid. 402 ("Evidence which is not

relevant is not admissible.").  Defendants contend that the list at issue is not relevant because

Primo *allows* its employees to access the internet during work hours for a reasonable period of

time.  Defendants also maintain that the internet usage of the employees in Plaintiff's list cannot

"be said to be substantially similar to plaintiff's continued personal use of the internet after *repeated* written warnings."  (Def.'s Mem. Supp. Mot. Strike p. 5 (emphasis in original).)

This Court will grant Defendants' Motion to Strike with respect to paragraphs 4 and 10 of Plaintiff's affidavit and Exhibit 6 to Plaintiff's opposition materials.  Plaintiff fails to forecast any evidence to suggest that she has personal knowledge regarding Mr. Davis' qualifications.  As a result, the contents of paragraph 4 of Plaintiff's affidavit are inadmissible under Rule 602.  The list of Primo employees who allegedly used the internet during working hours, moreover, is not relevant under Rules 401 and 402.  Defendants point out that Primo employees are permitted some reasonable access to the internet, and Plaintiff makes no attempt to suggest that the employees identified in her list accessed the internet excessively during work hours.  As a result, the list provided by Plaintiff does not "make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Fed. R. Evid. 401.  Finally, this Court notes that Plaintiff did not oppose Defendants' Motion to Strike.  Accordingly, Defendants' Motion to Strike is GRANTED with respect to paragraphs 4 and 10 of Plaintiff's affidavit and Exhibit 6 to Plaintiff's opposition materials.

## III.     *McDonnell Douglas* **Burden-Shifting Framework.**

Plaintiff has not proffered direct evidence of discriminatory intent and, as a result, must rely on the familiar three-step burden-shifting model of circumstantial evidence of discrimination set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  This burden-shifting test applies to Plaintiff's discrimination claims under Title VII, 42 U.S.C. § 1981, and 42 U.S.C. §1983.  *See Love-Lane v. Martin*, 355 F.3d 766, 786 (4th Cir. 2004) (explaining that the legal standard is the same for claims brought simultaneously under Title VII,

42 U.S.C. § 1981, and 42 U.S.C. § 1983), *cert. denied*, 543 U.S. 813 (2004); *see also Patterson v. McLean Credit Union*, 491 U.S. 164, 186 (1989) (applying Title VII analysis to claims brought under Section 1981).

To establish a cause of action for unlawful discrimination under Title VII, the plaintiff bears the initial burden of proving a *prima facie* case of discrimination. *McDonnell Douglas*, 411 U.S. at 802. There are specific elements that must be satisfied under a Title VII analysis for the plaintiff to meet this initial burden. If a *prima facie* case is established, the burden then shifts to the defendant to rebut the inference. *McDonnell Douglas*, 411 U.S. at 802. While the defendant's burden is not onerous, it must articulate "some legitimate, nondiscriminatory reason" for the disparate treatment. *Id.* In this regard, the Court "does not sit as a kind of super-personnel department weighing the prudence of employment decisions made by firms charged with employment discrimination" so that "when an employer articulates a reason for [its treatment of the plaintiff] not forbidden by law, it is not [the court's] province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the [employment decision]." *DeJarnette v. Corning, Inc.*, 133 F.3d 293, 298-299 (4th Cir. 1998) (internal quotations and citations omitted).

If the defendant articulates a legitimate, non-discriminatory reason for its conduct, the ultimate burden shifts to the plaintiff to show that the defendant's stated reason is "pretext." *McDonnell Douglas*, 411 U.S. at 804. In evaluating whether the plaintiff has adduced a sufficient quantity of proof, the court may consider the relative strength of the employer's asserted nondiscriminatory reasons. *Burns v. AAF-McQuay, Inc.*, 96 F.3d 728, 732 (4th Cir. 1996). However, unsubstantiated allegations and bald assertions will not carry the day for the employee.

*Evans v. Tech. App. & Serv. Co.*, 80 F.3d 954, 960 (4th Cir. 1996); *see also Goldberg v. B. Green & Co., Inc.*, 836 F.2d 845, 848 (4th Cir. 1988) (naked opinions and conclusory allegations are insufficient to withstand summary judgment).  If the plaintiff cannot present facts that would permit a reasonable inference that the stated reason is a pretext for discrimination, summary judgment in favor of the defendant should be granted.  *See Rowe v. Marley Co.*, 233 F.3d 825, 830 (4th Cir. 2000) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 146-47 (2000)).          **A.     *Prima Facie* Case.**

Plaintiff asserts different types of discrimination claims, including claims for discriminatory discharge, failure to promote, discriminatory discipline, and discrimination in the workplace or hostile work environment.  For the reasons stated below, Plaintiff fails to establish a *prima facie* case of discrimination with respect to each of these claims.

**1.     Discriminatory Discharge.**

To establish a *prima facie* case of discriminatory discharge, a plaintiff must show that she (1) is a member of a protected class, (2) suffered an adverse employment action, (3) at the time of the adverse employment action, she was performing at a level that met her employer's legitimate job expectations, and (4) that the position remained open or was filled by similarly qualified applicants outside the protected class.  *See Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 607 (4th Cir. 2000), *abrogation on other grounds recognized by Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284-85 (4th Cir. 2004).  In disparate treatment cases, a plaintiff may establish a *prima facie* case by presenting (1) direct evidence of discrimination, or (2) indirect evidence whose cumulative probative force would suffice under the controlling standard to support a reasonable probability of the inference that, but for the plaintiff's race, she

would have been promoted.  *See Autry v. N.C. Dept. of Human Resources*, 641 F. Supp. 1492, 1499 (W.D.N.C. 1986) (citations omitted).  Defendants do not dispute that Plaintiff is a member of a protected class or that her discharge constitutes an adverse employment action.  Instead, Defendants focus on the other elements of the *prima facie* case.

After reviewing the parties' submissions, this Court finds that Plaintiff has failed to establish a *prima facie* case in connection with her claim for discriminatory discharge or disparate treatment.  First, Plaintiff has failed to meet her burden of establishing that she was performing at a level that met her employer's legitimate job expectations.  There is no reasonable dispute in this case that Plaintiff's personal use of the internet while at work was excessive and constitutes ample reason for terminating her employment.  Similarly, there is no reasonable dispute that Plaintiff's failure to maintain an appropriate work schedule constitutes failure to perform at a level that met her employer's legitimate job expectations.  Second, Plaintiff has also failed to establish that her position remained open or was filled by similarly qualified applicants outside her protected class.  There is no dispute that Plaintiff's position was not filled by another applicant.  Instead, her responsibilities were distributed to other employees following her termination.

Finally, Plaintiff has failed to identify any evidence that would support a reasonable inference of unlawful discrimination.  To the contrary, the undisputed evidence in this case suggests that Plaintiff's employer acted reasonably by convincing her to withdraw her resignation and giving her the opportunity to obtain a promotion and raise.  This Court rejects, moreover, Plaintiff's attempt to satisfy this element by arguing that other white employees used the internet at work but were not fired.  This claim is not supported by the evidence in the record.  As an

initial matter, this Court has already struck a portion of the evidence that Plaintiff relies on to make this argument.  *See* Discussion *supra* § II (striking Exhibit 6).  This Court notes that, even if it were inclined to consider that evidence, it would make no difference in the context of the pending Motion for Summary Judgment.  Primo employees are permitted some reasonable access to the internet, and Plaintiff makes no attempt to suggest that the employees identified in her list accessed the internet excessively during work hours.  In addition, Defendants' discovery responses indicate that other employees, including individuals inside and outside the protected group, were warned verbally or in writing for personal use of the internet or company email.

### 2.      Failure to Promote.

To establish a *prima facie* case of failure to receive an increase in pay or grade, Plaintiff does not dispute that she must show that (1) she belongs to a protected group, (2) she was qualified and applied for the promotion, (3) she was considered for and denied that promotion, and (4) other employees of similar qualifications who were not members of the protected group were promoted at the time that the plaintiff's request for promotion was denied.  (*See* Pl.'s Opp. pp. 3-4; *see also* Def.'s Mem. Supp. Summ. J. p. 20); *Bundy v. Johnson*, 641 F.2d 934, 951 (D.C. Cir. 1995).  Again, Defendants do not dispute that Plaintiff is a member of a protected class or that she was considered for and denied a promotion and concentrate instead on the other elements of the *prima facie* case.

After reviewing the parties' submissions, this Court finds that Plaintiff has failed to establish a *prima facie* case in connection with her claim for failure to receive an increase in pay or grade in connection with the position of Electrical Coordinator.  First, Plaintiff has not established that she was qualified for the pay increase she sought.  As already noted, there is no

reasonable dispute in this case that Plaintiff failed to maintain a proper work schedule and used the internet excessively while at work.  In addition, Defendants forecast evidence showing that Plaintiff was not qualified for the position of Electrical Coordinator and did not qualify for the pay raise she sought within that position.  In particular, Plaintiff's evaluation by Mr. Hopkins reveals that Plaintiff could neither interpret nor prepare technical drawings proficiently.  Second, Plaintiff simply fails to forecast any evidence to suggest that any employees of similar qualifications who were not members of her protected group were promoted at the time that Plaintiff's request for promotion was denied.

Finally, Plaintiff's attempt to characterize this issue in her opposition papers as a "discriminatory demotion" also fails under a *McDonnell Douglas* analysis.  (*See* Pl.'s Opp. pp. 2-3.)  To establish a *prima facie* case of discriminatory demotion, a plaintiff must show that: (1) she is a member of a protected class; (2) she was demoted; (3) at the time of her demotion, she was performing her job at a level that met her employer's legitimate expectations; and (4) her demotion occurred under circumstances that raise a reasonable inference of unlawful discrimination.  *See Brinkley*, 180 F.3d at 607; *Halperin v. Abacus Tech. Corp.*, 128 F.3d 191, 201 (4th Cir. 1997), *abrogated on other grounds by Baird ex rel. Baird v. Rose*, 192 F.3d 462 (4th Cir. 1999).  In this case, Plaintiff is unable to establish that she was demoted, was performing at a level that met Primo's legitimate job expectations, or that her demotion occurred under circumstances that raise a reasonable inference of discrimination.  Plaintiff's excessive internet usage has already been noted.  In addition, Plaintiff fails to point to any evidence that her transfer from the position of Electrical Coordinator back to the position of CAD Operator was accompanied by a change in compensation, job title, level of responsibility, or opportunity for

promotion.  As a result, Plaintiff proffers no evidence from which a reasonable factfinder could

conclude that the transfer was a "demotion."  *Cf. James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d

371, 376 (4th Cir. 2004) ("[A]bsent any decrease in compensation, job title, level of

responsibility, or opportunity for promotion, reassignment to a new position commensurate with

one's salary level does not constitute an adverse employment action.") (quoting *Boone v. Goldin*,

178 F.3d 253, 256-57 (4th Cir. 1999)).  Finally, Plaintiff fails to forecast any evidence with

respect to the circumstances surrounding her alleged "demotion" that would support a reasonable

inference of unlawful discrimination.  Instead, the undisputed facts show that Plaintiff was unable

to perform the job responsibilities associated with the position of Electrical Coordinator, despite

being given at least two opportunities to prove herself, and was therefore transferred back to the

position of CAD Operator.  *See* Background and Procedural History *supra*.

### 3.       Discriminatory Discipline.

Plaintiff bases her cause of action for discriminatory discipline on the allegation that other

employees used the internet for personal use at work but, unlike Plaintiff, were not given written

or verbal warnings.  To establish a *prima facie* case of this type of claim, a plaintiff must show

that (1) she is a member of a protected class, (2) the prohibited conduct in which she engaged was

comparable in seriousness to misconduct of employees outside the protected class, and (3) she

suffered more severe discipline for her misconduct as compared to those employees outside the

protected class.  *Taylor v. Virginia Union Univ.*, 193 F.3d 219, 234 (4th Cir. 2004) (citation

omitted), *abrogation on other grounds recognized by Lockheed Martin*, 354 F.3d at 284-85.

Defendants focus their arguments on the last two elements of the *prima facie* case.

After reviewing the parties' submissions, this Court finds that Plaintiff has failed to

establish a *prima facie* case in connection with her claim for discriminatory discipline.  First, Plaintiff has not established that the prohibited conduct in which she engaged was comparable in seriousness to misconduct of employees outside the protected class.  As already noted, there is no reasonable dispute that Plaintiff's use of the internet for personal interests at work was excessive.  With respect to internet use by other employees, moreover, Plaintiff fails to provide any evidence to suggest that their use of the internet was comparable to hers.  In her deposition, for example, Plaintiff indicates that she does not know how long her co-workers used the internet.  (*See*, *e.g.*, People Dep. p. 129, ll. 1-3 ("Do you know approximately how much time Todd Davis put on the internet?  A: No.").)

Second, Plaintiff has failed to establish that she suffered more severe discipline for her misconduct than employees outside the protected class.  Plaintiff suggests that her discriminatory discipline claim is based on the allegation that "I was written up for a so-called policy violation in which I felt other employees, mainly white Caucasian, whatever you want to categorize them, were not written up."  (People Dep. p. 140, ll. 16-19.)  Defendants' discovery responses, however, indicate that other employees, including individuals inside and outside the protected group, were warned verbally or in writing for personal use of the internet or company email.  (*See* Def.'s Mem. Supp. Summ. J. Ex. 2, Response to Interrogatory 19.)  Again, Plaintiff forecasts no evidence to suggest that she was subjected to more severe discipline than employees outside the protected class.

**4.      Discrimination in Workplace/Hostile Work Environment.**

To establish a *prima facie* case of discrimination in the workplace, a plaintiff must show that she (1) belongs to a protected class, (2) was qualified for her job, (3) suffered an adverse

employment action, and (4) was treated differently from similarly situated employees.  *See*, *e.g.*, *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 455 (4th Cir. 1989).  To establish a *prima facie* case of hostile work environment, a plaintiff must show that (1) the harassment was unwelcome, (2) based on race or sex, (3) sufficiently severe or pervasive to alter the conditions of employment and create an abusive environment, and (4) there exists some basis for imposing liability on the employer.  *See Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183-84 (4th Cir. 2001).  Plaintiff bases her causes of action for discrimination in the workplace and hostile work environment on a series of allegations.  Specifically, Plaintiff complains that she was (1) required to undergo a "special evaluation," (2) denied "compensatory" time, (3) not assigned a mentor, (4) closely monitored at work and excluded from meetings, and (5) not paid medical benefits.

The fundamental problem with these causes of action is that Plaintiff's underlying allegations are baseless.  As a result, Plaintiff cannot demonstrate that she suffered an adverse employment action, was treated differently from similarly situated employees, or was subjected to unwelcome conduct sufficiently severe or pervasive to alter the conditions of employment.  The particular allegations at issue are considered in further detail below.

Plaintiff offers no cognizable explanation indicating that her "special evaluation" was objectionable.  (*See* People Dep. pp. 307-15.)  Plaintiff is unable to point to any evidence suggesting that she was treated differently from similarly situated employees because she was subjected to a "special evaluation."  Likewise, there is no dispute in this case that Plaintiff's employer did not have a "compensatory time" program.  Assuming that Plaintiff intended to allege the denial of "flex time" and not "compensatory time," Defendants emphasize that Plaintiff was allowed to work flexible hours under limited circumstances.  (*See* Def.'s Mem. Supp. Summ.

J. p. 27 & Ex. 17.)  Again, it is difficult to understand how Plaintiff could assert any complaint

based on the alleged denial of "compensatory time."

Similar problems exist with respect to Plaintiff's other allegations.  For example, there is

no reasonable dispute that Plaintiff's employer did not maintain a formal mentoring program.

Plaintiff has failed to present any evidence to support the contention that similarly situated

employees—*i.e.*, experienced employees at the Glen Burnie office—were assigned mentors.

(*See*, *e.g.*, People Dep. p. 277, l. 18 - p. 278, l. 2.)  As a result, it is hard to understand how

Plaintiff can claim that her employer discriminated against her by not appointing her a mentor.

Likewise, Plaintiff's allegations that she was "closely monitored" by her supervisor and excluded

from certain meetings are insufficient to support a claim for workplace discrimination or hostile

work environment.  (*See* Def.'s Mem. Supp. Summ. J. Exs. 16-17; People Dep. pp. 422-32.)

Plaintiff's attempt to ground a claim for discrimination on the alleged failure to pay

medical bills is also deficient.  That claim stems from the allegation that Primo's human resources

department failed to process Plaintiff's enrollment for medical benefits.  According to Plaintiff,

this resulted in the failure of Plaintiff's medical carrier to pay a bill for medical services in the

amount of $100.00.  Plaintiff also claims she later received harassing phone calls from credit

agencies in connection with this bill.  Putting aside the fact there is nothing about this claim that

remotely suggests discrimination based on race or sex, Defendants have forecast evidence that

Plaintiff enrolled herself for medical benefits using the internet. (*See* Def.'s Mem. Supp. Summ. J.

Ex. 34.)  Plaintiff does not dispute this evidence, which suggests that Primo's human resources

department cannot be held responsible for the medical benefit issue in this case.

Even if this Court assumed that the allegations asserted by Plaintiff as relevant to her

hostile work environment claim were based on admissible evidence, Plaintiff would still be unable to make a *prima facie* case.  Construing the evidence in the light most favorable to Plaintiff, her claim for hostile work environment fails because, under a totality of the circumstances, Defendants' alleged conduct was not objectively sufficiently pervasive or severe to alter a term or condition of her employment and thereby create an abusive work environment. *See*, *e.g.*, *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993) (in assessing whether a work environment is objectively hostile, the district court considered the totality of the circumstances, including the frequency and severity of the discriminatory conduct, whether it was physically threatening or humiliating or a mere offensive utterance, and whether it unreasonably interfered with an employee's work performance).

In sum, Plaintiff has failed to establish a *prima facie* case in connection with any of her asserted discrimination claims, *i.e.*, discriminatory discharge, failure to promote, discriminatory discipline, and discrimination in the workplace or hostile work environment.  As a result, Defendants' Motion for Summary Judgment is GRANTED with respect to these causes of action (Counts 1-2 & 4-6).

## B.      Legitimate Non-Discriminatory Reasons.

Even if Plaintiff could establish a *prima facie* case with respect to her discrimination claims, those claims would nevertheless fail as a matter of law.  Plaintiff has failed to create a genuine issue of material fact regarding whether the legitimate, non-discriminatory reason articulated by Defendants is a pretext for discrimination.  Defendants assert that Plaintiff's excessive use of the internet during work hours explains the denial of any promotion, any alleged "disciplinary" acts, and the termination of Plaintiff's employment.  (*See* Def.'s Mem. Supp.

Summ. J. p. 31.)  Plaintiff's various attempts to attack this proffered legitimate business reason

simply do not give rise to a genuine issue of material fact with respect to pretext.  For example,

Plaintiff asserts without any evidence that her supervisors were not qualified to review her.

Plaintiff argues that "excessive" use of the internet is not defined in the employee handbook.

Finally, Plaintiff claims that another employee was not disciplined for showing up late to work.

Even assuming that these allegations and arguments are truthful, and granting all reasonable

inferences in Plaintiff's favor, they are simply inadequate for purposes of allowing a reasonable

factfinder to conclude that the employment actions at issue were motivated by discrimination.

*See McDonnell Douglas*, 411 U.S. at 804.

**IV.     Retaliation.**

       This Court treats Plaintiff's claims for retaliation under Title VII and § 1981 separately

because of the Supreme Court's decision in *Burlington Northern & Santa Fe Ry. Co. v. White*,

___ U.S. ___, ___, 126 S. Ct. 2405, 2415 (2006).  In that opinion, which issued *after* the parties

completed briefing with respect to the pending Motion for Summary Judgment, the Supreme

Court held that a retaliation claim may proceed if the plaintiff can show "that a reasonable

employee would have found the challenged action materially adverse, which in this context

means it well might have dissuaded a reasonable worker from making or supporting a charge of

discrimination."  *Id*. at 13 (citations and internal quotation marks omitted).  In making this

determination, the Supreme Court rejected the Fourth Circuit's prior holding that a *prima facie*

case of retaliation under Title VII requires showing that the challenged employment action

"result[s] in an adverse effect on the 'terms, conditions, or benefits' of employment.'" *Id*. at 5

(quoting *Von Gunten v. Maryland*, 243 F.3d 858, 866 (4th Cir. 2001)); (*see also* Def.'s Mem.

Supp. Summ. J. p. 35 (relying on theApril 11, 2007 *Von Gunten* standard).)

As a result of the *Burlington* decision, a *prima facie* case of retaliation requires that the plaintiff establish that (1) she engaged in a protected activity, (2) her employer took an employment action against him that a reasonable employee would  have found materially adverse, and (3) there was a causal connection between the protected activity and the adverse employment action.  *See Burlington Northern & Santa Fe Ry. Co. v. White*, ___ U.S. ___, ___, 126 S. Ct. 2405, 2415 (2006); *Lockheed Martin, Inc.*, 354 F.3d at 298.  Like the other discrimination claims asserted in the Complaint Plaintiff has not proffered direct evidence of discriminatory intent and, as a result, must rely on the *McDonnell Douglas* burden-shifting approach discussed above.  This approach applies to Plaintiff's retaliation claims under Title VII and 42 U.S.C. § 1981.  *See Love-Lane*, 355 F.3d at 786; *Patterson*, 491 U.S. at 186.

In this case, Plaintiff fails to establish a *prima facie* case of retaliation because she has forecast absolutely no evidence that would support the conclusion that there was a causal connection between the alleged protected activity (contacting the EEOC/NAACP) and the adverse employment action (discharge).  Plaintiff points to nothing to suggest that Defendants had notice that Plaintiff intended to contact, or actually contacted, the EEOC or NAACP.  The internet monitoring reports do not suggest otherwise, and this Court rejects Plaintiff's unsupported allegation that certain internet monitoring reports were not produced during the discovery phase of this litigation.  Even if Plaintiff could establish a *prima facie* case with respect to her discrimination claims, moreover, for reasons already explained, Plaintiff fails to create a genuine issue of material fact regarding whether the legitimate, non-discriminatory reason articulated by Defendants (excessive internet use) is a pretext for discrimination.

In addition, this Court rejects Plaintiff's attempt to characterize her retaliation claim as based on her "opposition" to her alleged exclusion from meetings at the Baltimore Detention Center.  Similarly deficient are her complaints that Ray Hopkins was creating a "hostile work environment" by placing a sticky note on her computer and sending emails related to her internet usage and attendance at work.  As already noted, to satisfy the first prong of the *prima facie* test, Plaintiff must show that she engaged in "protected activity."  There are two categories of protected activity: participation and opposition.[5]  In her opposition papers, Plaintiff asserted for the first time that her retaliation claim in this case is also based on opposition activity.  (*See* Pl.'s Opp. p. 10.)  The United States Court of Appeals for the Fourth Circuit has held that "opposition activity is protected when it responds to an employment practice that the employee *reasonably believes* is unlawful."  *Jordan v. Alternative Resources Corp.*, 458 F.3d 332, 338-39 (4th Cir. 2006) (emphasis in original) (citing *EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 406-07 (4th Cir. 2005) and *Peters v. Jenney*, 327 F.3d 307, 320-21 (4th Cir. 2003)).  Here, Plaintiff fails to point to any evidence to suggest that she held a reasonable belief that exclusion from meetings or receiving emails regarding internet usage or attendance at work constitutes an unlawful employment practice.  Accordingly, Defendants' Motion for Summary Judgment is GRANTED with respect to Plaintiff's causes of action for retaliation under Title VII and 42 U.S.C. § 1981 (Counts 3 & 7).

---

[5]      The relevant provision of Title VII provides: "It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has *opposed* any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or *participated* in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a) (emphasis added).

**V.      Title VII Claims Against Individual Employees.**

It is well-established that "[e]mployees are not liable in their individual capacities for Title

VII violations."  *Lissau v. Southern Food Service, Inc.*, 159 F.3d 177 (4th Cir. 1998).  As a result,

Defendants' Motion for Summary Judgment is GRANTED with respect to Plaintiff's causes of

action for retaliation under Title VII against individual Defendants Robert Wilson, Ray Hopkins,

and Darcia C. Perini (Counts 1-3).

**VI.     § 1983 Claims.**

To state a claim for relief under 42 U.S.C. § 1983, Plaintiff must demonstrate that

Defendants' allegedly unlawful discrimination was perpetrated under color of state law.[6]

> The color of law requirement excludes from the reach of § 1983 all
> "merely private conduct, no matter how discriminatory or
> wrongful." *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50
> (1999) (citation and internal punctuation omitted).  If the substance
> of § 1983 is not to be substantially eviscerated, however, "its ambit
> cannot be a simple line between States and people operating outside
> formally governmental organizations." *Brentwood Acad. v.
> Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001).
> Section 1983 therefore includes within its scope apparently private
> actions which have a "sufficiently close nexus" with the State to be

---

[6]      42 U.S.C. § 1983 provides in relevant part:

Every person who, under color of any statute, ordinance,
regulation, custom, or usage, of any State or Territory or the
District of Columbia, subjects, or causes to be subjected, any
citizen of the United States or other person within the jurisdiction
thereof to the deprivation of any rights, privileges, or immunities
secured by the Constitution and laws, shall be liable to the party
injured in an action at law, suit in equity, or other proper
proceeding for redress, except that in any action brought against a
judicial officer for an act or omission taken in such officer's
judicial capacity, injunctive relief shall not be granted unless a
declaratory decree was violated or declaratory relief was
unavailable.

"fairly treated as that of the State itself." *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1974). "[T]here is no specific formula for defining state action" under this standard. *Hicks v. Southern Maryland Health Sys. Agency*, 737 F.2d 399, 402 n. 3 (4th Cir. 1984) (quoting *Howerton v. Gabica*, 708 F.2d 380, 383 (9th Cir. 1983)). Rather, the question of what is fairly attributable to the State "is a matter of normative judgment, and the criteria lack rigid simplicity." *Brentwood Academy*, 531 U.S. at 295.

*Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003). In this case, Plaintiff fails to forecast evidence that would support treating the private actions at issue as conduct of the State. (*See, e.g.*, People Dep. p. 317, l. 6 - p. 318, l. 3. (acknowledging that Defendants did not conspire with any State entity for purposes of depriving Plaintiff of her civil rights).) This Court rejects Plaintiff's attempt to satisfy the state action requirement by pointing out that "Primo contracted with Baltimore County, a municipality, on to services that involved Plaintiff." (Pl.'s Opp. p. 12.) Accordingly, the lack of a sufficient nexus between Defendants and the State constitutes independent grounds for granting Defendants' Motion for Summary Judgment with respect to Plaintiff's causes of action under 42 U.S.C. § 1983 (Counts 4-5). *See* Discussion *supra* § III (resolving Counts 4-5 in Defendants' favor under a *McDonnell Douglas* analysis).

## VII.    State Law Claims.

### A.    Intentional Infliction of Emotional Distress.

In the State of Maryland, a claim of intentional infliction of emotional distress has four elements: "'(1) The conduct must be intentional or reckless; (2) [t]he conduct must be extreme and outrageous; (3) [t]here must be a causal connection between the wrongful conduct and the emotional distress; (4) [t]he emotional distress must be severe.'" *Manikhi v. Mass Transit Admin.*, 758 A.2d 95, 113 (Md. 2000) (quoting *Harris v. Jones*, 380 A.2d 611, 614 (Md. 1977)). Maryland courts have confirmed that the tort of intentional infliction of emotional distress is to be

used "sparingly" and only for "opprobrious behavior that includes truly outrageous conduct." *Kentucky Fried Chicken Nat'l Mgmt. Co. v. Weathersby*, 607 A.2d 8, 11 (Md. 1992).  This Court has previously acknowledged that intentional infliction of emotional distress "is rarely viable in a case brought under Maryland law."  *Robinson v. Cutchin*, 140 F. Supp. 2d 488, 494 (D. Md. 2001) (citing *Bagwell v. Peninsula Reg'l Med. Ctr.*, 665 A.2d 297, 319 (Md. Ct. Spec. App. 1995), *cert. denied*, 669 A.2d 1360 (Md. 1996)).

After reviewing the papers submitted by the parties, this Court finds that Plaintiff's claim for intentional infliction of emotional distress fails as a matter of law.  This claim appears to be based on the following allegations: (1) one of Plaintiff's supervisors—Ray Hopkins—placed a "sticky note" on her computer when Plaintiff was not at her work station, (2) Plaintiff's supervisors—including Ray Hopkins, Robert Wilson, and Darcia C. Perini—did not "sit down with [Plaintiff] to go over [her] issues one-to-one," (People Dep. p. 321, ll. 4-5), and (3) Defendants should have, but did not, pay for Plaintiff's medical bill.  As a result, Plaintiff contends that she became depressed and could neither sleep nor eat.  (*See generally id*. at pp. 319-324; Pl.'s Opp. pp. 12-13.)  This Court finds that the conduct identified by Plaintiff as supporting her claim for intentional infliction of emotional distress is neither "intentional or reckless" nor "extreme and outrageous."  *Manikhi*, 758 A.2d at 113.  Accordingly, Defendants' Motion for Summary Judgment is GRANTED with respect to Plaintiff's cause of action for intentional infliction of emotional distress (Count 8).

**B.      Intentional Misrepresentation and Fraud.**

In Maryland, the torts of intentional misrepresentation and fraud are essentially the same. The elements of these causes of action are:

> (1) that a representation made by a party was false; (2) that either its falsity was known to that party or the misrepresentation was made with such reckless indifference to truth to impute knowledge to him; (3) that the misrepresentation was made for the purpose of defrauding some other person; (4) that that person not only relied upon the misrepresentation but had the right to rely upon it with full belief of its truth, and that he would not have done the thing from which damage resulted if it had not been made; and (5) that that person suffered damage directly resulting from the misrepresentation.

*B.N. v. K.K.*, 538 A.2d 1175, 1182 (Md. 1988) (quoting *Suburban Mgmt. v. Johnson*, 204 A.2d 326, 329 (Md. 1964)).  In this case, Plaintiff's claims for intentional misrepresentation and fraud are based on the allegation that Plaintiff's "medical insurance was not processed properly," (People Dep. p. 326 ll. 21-22), which allegedly resulted in an unpaid bill for medical services in the amount of $100.00.  However, Plaintiff fails to forecast evidence of a misrepresentation, or evidence of a misrepresentation that made for the purpose of defrauding Plaintiff.  Accordingly, Defendants' Motion for Summary Judgment is GRANTED with respect to Plaintiff's causes of action for intentional misrepresentation and fraud (Counts 9-10).

### C.    Negligence.

In Maryland, a cause of action in negligence requires that the plaintiff show: (1) that the defendant owed a duty to the plaintiff; (2) that the defendant breached that duty; (3) that the plaintiff suffered actual injury or loss; and (4) that the loss or injury proximately resulted from the defendant's breach of the duty.  *See, e.g.*, *Rosenblatt v. Exxon Co., U.S.A.*, 642 A.2d 180, 188 (Md. 1994) (citations omitted).  Here, Plaintiff's claim is based on alleged negligence with respect to the unpaid bill for medical services in the amount of $100.00 and the allegedly negligent hiring, training, and supervision of Ray Hopkins.  (*See* Compl. ¶¶ 69-74.)  However, Plaintiff fails to identify any evidence that would support the elements of breach and causation.

With respect to any causes of action for negligent hiring, training, or supervision, Plaintiff does not dispute that she elected not to take discovery with respect to these claims and, as a result, no relevant evidence exists.  (*See generally* Def.'s Mem. Supp. Summ. J. pp. 44-45; Pl.'s Opp. p. 13.)  Accordingly, Defendants' Motion for Summary Judgment is GRANTED with respect to Plaintiff's cause of action for negligence (Count 11).

### D.      Wrongful Termination.

In Maryland, "an employment contract of indefinite duration, that is, at will, can be legally terminated at the pleasure of either party at any time."  *Adler v. American Standard Corp.*, 432 A.2d 464, 467 (Md. 1981); *Page v. Carolina Coach Co.*, 667 F.2d 1156, 1158 (4th Cir. 1982) (applying Maryland law).  Maryland law recognizes a common law exception to the at-will doctrine "when the motivation for the discharge contravenes some clear mandate of public policy."  *Adler*, 432 A.2d at 473.  To sustain a claim for wrongful discharge, the employee must show that (1) he was discharged; (2) the basis for his discharge violates some clear mandate of public policy; and (3) there is a nexus between the employee's conduct and the employer's decision to fire the employee.  *See Wholey v. Sears Roebuck & Co.*, 803 A.2d 482, 489 (Md. 2002).  Whether an employee has satisfied his burden of proving that his termination violated a clear mandate of public policy is a question of law.  *Id.* at 487 (citations omitted).

In this case, Plaintiff's claim for wrongful discharge is based on the alleged failure to pay her bill for medical services in the amount of $100.00.  (*See*, *e.g.*, Compl. ¶ 76.)   After reviewing the parties' submissions, this Court finds that Plaintiff's claim for wrongful discharge fails as a matter of law.  First, Plaintiff failed to meet the threshold requirement of "plead[ing] with particularity the source of the public policy" allegedly violated by his termination.  *Porterfield v.*

*Mascari II, Inc.*, 788 A.2d 242, 245 (Md. Ct. Spec. App. 2002), *aff'd*, 823 A.2d 590 (Md. 2003).

Second, even if Plaintiff had appropriately identified the source of the public policy,

Plaintiff does not dispute that she was terminated *before* Defendants learned about the issue with

her medical bill.  As a result, there is simply no basis upon which a reasonable factfinder could

conclude that Plaintiff's termination was related to the unpaid medical bill.  Accordingly,

Defendants' Motion for Summary Judgment is GRANTED with respect to Plaintiff's cause of

action for wrongful discharge (Count 12).

      **E.**     **Conversion.**

     The elements of the tort of conversion are well-established:

> Conversion is an intentional tort, consisting of two elements, a
> physical act combined with a certain state of mind.  The physical
> act can be summarized as "any distinct act of ownership or
> dominion exerted by one person over the personal property of
> another in denial of his right or inconsistent with it."  *Allied
> Investment Corp. v. Jasen*, 731 A.2d 957, 963 (Md. 1999) (quoting
> *Interstate Ins. Co. v. Logan*, 109 A.2d 904, 907 (Md. 1954)).  This
> act of ownership for conversion can occur either by initially
> acquiring the property or by retaining it longer than the rightful
> possessor permits.

*Darcars Motors of Silver Springs, Inc. v. Borzym*, 841 A.2d 828, 835 (Md. 2004).  In this case,

Plaintiff's claim for conversion is based on two theories: (1) Defendants improperly retained

possession of personal documents that Plaintiff saved on the hard drive of a company computer,

and (2) Plaintiff's healthcare premiums were improperly deducted from her paycheck.  (*See

generally* Compl. ¶¶ 79-82; Pl.'s Opp. pp. 13-14.)  These theories cannot support a cause of

action for conversion as a matter of law.  First, Plaintiff fails to establish that she enjoys any

ownership interest in documents that she saved on the hard drive of a company computer.

Second, Plaintiff fails to forecast any evidence to suggest that premiums were improperly

deducted from her paycheck.  Accordingly, Defendants' Motion for Summary Judgment is

GRANTED with respect to Plaintiff's cause of action for conversion (Count 13).

## **CONCLUSION**

For reasons stated above, Defendants' Motion to Strike (Paper No. 26) is DENIED-IN-

PART and GRANTED-IN-PART and Defendants' Motion for Summary Judgment (Paper No.

22) is GRANTED.  A separate Order follows.


Dated: April 12, 2007                              /s/_____
                                                   Richard D. Bennett
                                                   United States District Judge